UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RONNIE JOSEPH ZUNIGA, | ) | Case No.: 1:13-cv-00096-LJO-JLT |
| Petitioner, | ) ) ) | FINDINGS AND RECOMMENDATIONS TO DENY PETITION FOR WRIT OF HABEAS |
| v. | ) ) | CORPUS (Doc. 1) |
| TIM VIRGA, Warden, | ) ) | ORDER DIRECTING THAT OBJECTIONS BE |
| Respondent. | ) ) | FILED WITHIN TWENTY-ONE DAYS |

In 2010, petitioner was convicted of three counts of premeditated attempted murder and one count of shooting at an occupied vehicle.  The convictions resulted in a sentence of 54-years-to-life.  In this action, Petitioner asserts the trial court erred in admitting various spontaneous statements of a witness who did not testify which, he claims violated his right of confrontation.  Finally, he claims his attorney was ineffective for failing to object to the statements and that cumulative error requires a grant of the petition.  Because the Court concludes the there was no error in the admission of the statements—and these claims sound only in state law—the Court will recommend the petition be **DENIED**.

I.      **PROCEDURAL HISTORY**

In 2010, petitioner was convicted of three counts of premeditated attempted murder and one count of shooting at an occupied vehicle.  The jury also found true special allegation related to Petitioner's participation in a criminal street gang and the use of a firearm.  The convictions resulted in

1

1    a sentence of an indeterminate term of 54-years-to-life.

2         Petitioner's appeal to the California Court of Appeals, Fifth Appellate District (the "5th DCA"),

3    resulted in the Court affirming the conviction.  (Lodged Document ("LD") 17).   Likewise, his petition

4    for review in the California Supreme Court was summarily denied.  (LD 18; 19).

5    **II.    FACTUAL BACKGROUND**

6         The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

7    Appellant Ronnie Zuniga and his codefendant Richard Larios were two of three Norteno
     occupants of a brown or tan Mercury Cougar automobile that stopped to get gas at a
8    convenience store on Bardsley Avenue in Tulare.  Already there at a gas pump was a black
     Nissan Maxima occupied by two Surenos, Irving Rodriguez and Juan Saucedo, and a friend of
9    Rodriguez's since childhood, 17–year–old Stephanie G.  After some staring or "mad dogging"
     between the rival gang members at the gas pumps, and a brief verbal exchange between Norteno
10   Zuniga and Sureno Saucedo when the two men went inside the store to pay for gas, the Cougar
     followed the Maxima when the Maxima drove away from the convenience store. A short
11   distance away, approximately five gunshots were fired from the Cougar, at least four of which
     struck the Maxima. None of the bullets struck any of the three occupants of the Maxima,
12   although Stephanie G. received cuts from shattered window glass.

13   A first trial ended when the jury could not reach a verdict.  In the second trial, the subject of this
     appeal, a jury found both Larios and Zuniga guilty of three counts of premeditated attempted
14   murder (Pen.Code, §§ 664/187, subd. (a))1 and one count of shooting at an occupied motor
     vehicle (§ 246). The jury also found that the crimes were committed for the benefit of a street
15   gang (§ 186.22, subd. (b)(4)) and that a principal personally discharged a firearm in the
     commission of each crime (§ 12022.53, subds.(c) and (e)(1)).  Each defendant was sentenced to
16   a term of 54 years to life.

17   Only two of the six persons involved in the incident—victims Stephanie G. and Irving
     Rodriguez—testified at the trial.  Juan Saucedo refused to testify and was held in contempt of
18   court.  Rodriguez at first also refused to testify, but changed his mind after being held in
     contempt.  Larios and Zuniga exercised their right not to testify, and the third occupant of the
19   Mercury Cougar was never identified at trial or called as a witness.

20   APPELLANT'S CONTENTIONS

21   Appellant contends the trial court: (1) erred in admitting into evidence, under the "spontaneous
     statement" exception to the hearsay rule (Evid.Code, § 1240), statements made by Juan Saucedo
22   to a police officer shortly after the shooting; (2) denied him his Sixth Amendment right to be
     confronted with the witness against him by admitting into evidence these same Saucedo
23   statements; (3) erred in admitting into evidence, under the "spontaneous statement" exception to
     the hearsay rule (Evid.Code, § 1240), testimony by Stephanie G. describing what Juan Saucedo
24   told Stephanie G., shortly after Saucedo returned to the Maxima after paying for the gas, about a
     verbal exchange Saucedo had with appellant while the two men were inside the convenience
25   store; (4) erroneously imposed a section 12022.53 firearm use enhancement on the conviction
     for discharging a firearm at an occupied vehicle (§ 246). Appellant also contends (5) his trial
26   counsel's failure to raise a confrontation clause objection to the admission of Saucedo's

27   _____
     [1]  The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).
28   Thus, the Court adopts the factual recitations set forth by the 5th DCA.

statements to Officer Faiman deprived him of his right to the effective assistance of counsel, and (6) the cumulative effect of purported errors "(1)" through "(3)" above requires reversal of the judgment.

 Respondent concedes the sentencing error. (See People v. Brookfield (2009) 47 Cal.4th 583, 595–597; and People v. Gonzalez (2010) 180 Cal.App.4th 1420, 1424–1427.)  We will therefore direct the court to strike the 20–year section 12022.53 enhancement that was imposed (and stayed pursuant to § 654) on the count 4 conviction for shooting at an occupied motor vehicle (§ 246). As we shall explain, however, all of appellant's other arguments fail to demonstrate any error warranting reversal of the judgment.

FACTS

On October 20, 2008, Stephanie G. and her friend, Irving Rodriguez, went with Juan Saucedo to a local convenience store and gas station in Saucedo's car, a black Nissan Maxima. Rodriguez drove; Saucedo sat directly behind Rodriguez; and Stephanie G. sat in the front passenger seat. Rodriguez and Saucedo were both Southern (or Sureno) gang members; Stephanie G., 17 years old and pregnant, was not a gang member.

At the gas station, Saucedo went inside to pay for the gasoline while Rodriguez pumped the gasoline. Stephanie G. remained in the car.

While they were at the gas station, another car, a Cougar pulled up with three people inside. One person from the Cougar went inside while another pumped the gasoline.

When Saucedo came outside from paying for the gasoline, he appeared to Stephanie G. to be somewhat angry. He stated that the person from the Cougar who went inside the store said to Saucedo, "What's up Ene[?]" Saucedo responded, "What's up Ese[?]"  Other testimony established that Northern (or Norteno) gang members identified themselves with the letter N or "Ene" in Spanish, and Southern gang members identified themselves with the letter S or "Ese" in Spanish.  Addressing a Northerner as a Southern gang member by saying "What's up, Ese?" and likewise addressing the Southern gang member as a Northerner by saying "What's up, Ene?" was a sign of disrespect.  Stephanie G., who knew of her companions' gang affiliation, was concerned by the confrontation.

When Stephanie G. and her companions left the gas station, the Cougar followed them; it continued to do so when they turned onto another street. When the Maxima stopped at a stop sign, the Cougar came up alongside the left side of the Maxima, and shots were fired at the Maxima from that direction.

Stephanie G. ducked after the first shot, and did not see where the Cougar went. Stephanie G. received cuts in her arm from glass shattered by the shooting.

At approximately 6:30 p.m. that night, Tulare City Police Officer Jeremy Faiman was on patrol on R Street near Bardsley Avenue when he heard approximately five gunshots.  Thinking someone might be shooting at him, Officer Faiman looked to his left and right before directing his attention ahead, from where he believed the shots originated.  There, he saw a black Nissan Maxima, which turned out to be Saucedo's car.

Believing the Maxima was involved in the shooting, Officer Faiman sped up to follow the vehicle.   Eventually, Officer Faiman and other officers effected a felony stop of the Maxima.

During the stop, Rodriguez yelled that he could not show his hands because the window had been shot out, and that there was a pregnant female in the car, who was bleeding. Saucedo yelled that he was the victim, and that they had just been shot at.  Sometime during the stop,

3

Saucedo told Stephanie G. to say that they were just going to the store; later, at his suggestion, she lied to the police, saying that they were there to cash a check.

The occupants of the Maxima were called out of the vehicle one by one, and handcuffed, while Officer Faiman had his weapon drawn. After the occupants were removed from the car, the officers, searched the car for weapons, but found none.

Officer Faiman then spoke with Juan Saucedo, who appeared "nervous" and "upset." Saucedo stated that he was at the gas station when another car pulled in behind him; the occupants of the car were "mad dogging" him.  He left the gas station and was at a stop sign on Cedar and R Street when the other car pulled alongside him and one of the passengers began "blasting" on him.

Irving Rodriguez told Tulare City Police Officer Michael Melikian that he had left the gas station and was at the stop sign when he heard four or five gunshots. He noticed his car was being shot at, and he sped away. Immediately afterward, he was stopped by the police officers. He did not say another car shot at him.

Because of the cuts on her arm and because of her pregnancy, Stephanie G. was taken by ambulance to Tulare District Hospital.  At the hospital, she told Tulare City Police Officer Bill Robertson that they were at gas pump at the gas station when a silver or gray Cougar pulled alongside the driver's side of Stephanie G.'s car, and "they exchanged dirty looks with herself and the occupants of the car."

Stephanie G. then related that when they stopped at Cedar and R Street, the same car they had seen earlier pulled alongside Stephanie G.'s vehicle.  Stephanie G. heard a booming noise and ducked down. She then heard four additional shots.

Approximately one or two hours after the shooting, Tulare City Police Department Detective Jesus Guzman spoke with Rodriguez.  Rodriguez stated that, while he pumped gasoline in the car, three Northern gang members "mad dogg[ed]" him and Saucedo. One was Hispanic, approximately five feet seven inches tall, with a shaved head and a mustache. Another was Hispanic, approximately five feet seven inches tall, had a heavy-set build, had a shaved head, and was dressed in black. The third person was five feet eight inches to five feet nine inches tall with a medium build, and wore a gray hooded sweatshirt. When arrested in November of 2008, codefendant Larios had a shaved head, a mustache, and a goatee.

When Rodriguez left the gas station, he noticed the other vehicle, a silver or gold-colored Cougar, followed him. When Rodriguez stopped at a stop sign, the Cougar came alongside the driver's side of Rodriguez's car and shots were fired.

 That same night, Rodriguez identified codefendant Larios in a photographic lineup, as did Stephanie G.  However, Stephanie G. was unable to identify appellant in a photographic lineup, and instead identified another, unknown person. At a previous hearing in the present case, Stephanie G. identified both appellant and Larios.

A surveillance video at the store showed Saucedo and appellant inside the store. Other views showed Saucedo and appellant outside the store.

After the shooting, on October 22, 2008, Tulare City Police Officer Priscilla Solis examined the Maxima. There were four bullet holes in the vehicle: two near the window of the rear driver's side door, one in the center of the rear window, and one on the top right portion of the window. The front driver's side window was shattered. There were bullet fragments inside the car behind the front passenger side seat and just behind the headrest of the rear passenger side seat.

On that same day, Officer Solis assisted in a search of a residence on Amber Street in Tulare.

There, she found marijuana, court paperwork with Larios's name, some other pictures, and an address book.

On October 24, 2008, Tulare City Police Officer Daniel Dohner was dispatched to an alley on the 700 block of East Ventura because fire department personnel had found a burned-out vehicle. At the scene, he found an "early model Mercury Cougar" although it was impossible to tell the color of the vehicle because of the fire. The license plate number was 5DKE893.

Earlier, in July of 2008, Tulare City Police Officer Misael Aguayo came into contact with codefendant Larios while Larios was near a gold Mercury Cougar, with the same license plate number as that of the Cougar Officer Dohner found on October 24, 2008. Similarly, on September 29, 2008, Detective Guzman encountered Larios and appellant in a "brownish silverish color or gold color" Mercury Cougar with the same license plate number as that found by Officer Dohner. Larios drove the car and appellant was the front passenger.

Both appellant and codefendant Larios were at a residence on Becky on November 18, 2008. Larios was seen leaving the residence, and appellant was at the residence when officers executed a search warrant.

Tulare City Police Officer Tony Espinoza was part of a "take-down unit" for a team conducting surveillance at the residence on Becky.  Larios was a passenger seat in a Ford Mustang, which Officer Espinoza followed.

Officer Espinoza stopped the vehicle; when he did so, Larios "took off running." Officer Espinoza chased Larios over a three-foot concrete wall and two six-foot wooden fences while repeatedly ordering him to stop. Eventually, when ordered to stop at gunpoint, Larios complied.

Raul Luna lived at the Becky address in November of 2008. At trial, he denied being a gang member, although he admitted sometimes associating with Northern gang members. However, Detective Guzman opined that Luna was a Northern gang member based "on his association" and on Detective Guzman's knowledge that Luna came from Salinas and went by the nickname "Salas." Detective Guzman spoke with Luna on November 18, 2008. Luna stated that Larios and appellant had been staying at the house approximately a week because they were on the run from the police because of a shooting.

 At trial, Stephanie G. could not identify the person who pumped the gasoline. She stated that no one "mad dogg[ed]" her that night, although she noticed someone from the Cougar "looking over at the cars." She stated, "I don't know if they was looking at a mean way or.... They was just looking."

Rodriguez initially refused to testify, even under a grant of immunity and under the threat of being held in contempt. He was held in contempt and placed in custody.

Later, Rodriguez testified, admitting that he had six felony convictions and had previously served time in prison. He testified he did not notice anything out of the ordinary at the gas station until Saucedo told him something was happening. The people, males, were a few pumps away, but Rodriguez did not particularly look at them, and was "[n]ot at all" worried. He testified that he could not remember the make or color of the car.

Rodriguez testified that when he stopped at the stop sign, he noticed "a couple guys running across the street on my left-hand side, not running, like not, not doing the [crosswalk].  They were running across the street towards where I was at.  And that's when I heard shots fired, you know, so I sped off and there was another car behind us that sped off too. And after that I got pulled over and the rest of the story unfolds on its own."  Rodriguez did not recall telling Detective Guzman that the three people at the pump "mad dogg [ed]" him. He recalled pointing out someone in a lineup, and stated, "I might have told him [Detective Guzman] that I was 50–

5

50 positive" with regards to that being one of the persons involved.

Rodriguez was then impeached with the testimony of Detective Guzman, who testified about a statement Rodriguez had given Guzman only an hour after the shooting. Guzman testified that as he was pumping gas into the Maxima, three Nortenos had been "mad dogging" him and Juan Saucedo. When he left the gas station, these same three individuals followed him in a silver or gold-colored Cougar, and when he was heading north on R Street and stopped at a stop sign at Cedar Street, "the Cougar that was behind them came along the driver's side and shots were fired." Rodriguez told Guzman he "believed it happened because of him and his friend were southern gang members and the other subjects were Norteno gang members." There was no mention in Rodriguez's earlier statement of him having seen anyone on foot at the scene of the shooting. Guzman met with Rodriguez a second time about an hour after the first meeting (i.e. about two hours after the shooting), and at that time Rodriguez "within a couple seconds" identified a picture of codefendant Larios in a photo lineup shown to him by Guzman.

At trial, Raul Luna testified that in November of 2008, appellant and Larios were not staying at his house, but "[i]f they needed a spot to stay, they could come over and stay. That's about it." They did not stay even a week there. Luna denied telling Detective Guzman that they had stayed there a week, and testified that neither Larios nor appellant ever said they were involved in a shooting.

The parties stipulated that Detective Guzman was qualified to testify as an expert on Northern and Southern gangs in the present case. Given a hypothetical similar to the evidence presented in the present case, Detective Guzman opined that the crime was gang-related. He opined that the crime benefitted the Northern gang by attempting to remove a Southern rival, and promoted the violence the gang was known for by the shooting at rival gang members.

Defense

The defense called Reynalda Ochoa to testify. She said she lived on S Street. The night of the shooting, she was inside when she heard gunshots. When she looked outside, she saw three young people running through an alley.

Detective Guzman testified that there had been other shootings in the area both before and after the October 20, 2008, incident, most recently two weeks before Detective Guzman's testimony. The area was the territory of the East Side Nortenos.

(LD 17, pp. 1-10).

## III.  DISCUSSION

### A.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3);  Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

1   On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996

2   ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v.

3   Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997);  Jeffries v. Wood,

4   114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds*

5   *by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's

6   enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed

7   by its provisions.

8        B.        Legal Standard of Review

9        A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the

10   petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision that was

11   contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

12   by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an

13   unreasonable determination of  the facts in light of the evidence presented in the State court

14   proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S.

15   at 412-413.

16        A state court decision is "contrary to" clearly established federal law "if it applies a rule that

17   contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts

18   that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."

19   Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

20        In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court

21   explained that an "unreasonable application" of federal law is an objective test that turns on "whether

22   it is possible that fairminded jurists could disagree" that the state court decision meets the standards set

23   forth in the AEDPA. The Supreme Court has "said time and again that 'an *unreasonable* application of

24   federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct.

25   1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court

26   "must show that the state court's ruling on the claim being presented in federal court was so lacking in

27   justification that there was an error well understood and comprehended in existing law beyond any

28   possibility of fairminded disagreement."  Harrington, 131 S.Ct. at 787-788.

7

The second prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500. A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard. Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002); Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

## IV.   Petitioner's Claims

The instant petition itself alleges the following as grounds for relief: (1) the trial court erred in admitting the statement of Juan Saucedo as a spontaneous declaration to Officer Faiman; (2) admission of Saucedo's statement violated Petitioner's Sixth Amendment confrontation right; (3) ineffective assistance of trial counsel in failing to object to admission of Saucedo's statement; (4) trial court error in admitting spontaneous statement by Saucedo to Stephanie G.; and (5) cumulative error.

///

A.    Saucedo's Statement To Officer Faiman.

Petitioner first contends that the trial court erred in admitting the statement of witness Saucedo to Officer Faiman as a spontaneous declaration exception to the hearsay rule.  This contention is without merit.

1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

**A. Facts**

On October 7, 2009, the People submitted a motion in limine seeking to allow the statement of Saucedo to Stephanie G. and the statements of the victims to police officers as spontaneous statements.

On February 2, 2010, the trial court held an Evidence Code section 402 hearing "with regards to statements made by witnesses who may or may not testify at trial at or near the scene of the alleged shooting which may qualify as an exception to the hearsay rule under the spontaneous utterance, excited declaration exception to the hearsay rule."  The trial court further stated that counsel for the defense both objected to use of any of the statements.

At the Evidence Code section 402 hearing, Tulare City Police Officers Jeremy Faiman, Michael Melikian, and Bill Robertson testified.

The testimony showed the following: The stop occurred a few minutes after the shooting. Officer Faiman did not know exactly how long it took from the time he pulled the car over for the other officers to arrive on the scene, "but it was pretty, pretty quick." Officer Melikian testified that he arrived at Officer Faiman's location approximately three to four minutes after being dispatched there.

During the stop, Officer Faiman had his gun drawn. When stopped, Rodriguez stated he could not roll down the window because it had been shot through, and stated there was a pregnant girl, who was bleeding, in the car. He stated repeatedly that they were the victims, and seemed "very upset, distraught." Saucedo also appeared distraught and upset, and stated that they were victims.

The occupants of the car were called back to Officer Faiman's patrol car at gunpoint, handcuffed, and checked for weapons. At some point, the car was also searched for weapons. Approximately five minutes elapsed from the time the occupants were removed from the vehicle to the time the officers began talking with them.

Officer Faiman spoke with Juan Saucedo. Saucedo "was obviously upset. He was kind of rocking in a rocking motion as to being upset and he just seemed real nervous and excitable."

 Officer Faiman asked Saucedo what had happened. Saucedo stated he was at the gas station getting gas when he saw another car pull up behind him. Some people gave him angry looks and "mad dogg[ed]" him.

Saucedo stated he left, went onto Bardsley Avenue, turned right on R Street, and stopped at a stop sign on R Street and Cedar. A brown car pulled in behind him and then pulled to the side of Saucedo's vehicle, where a person in the passenger seat began shooting at him.

9

Officer Faiman asked whether it was possibly Northern gang members that shot at him, and Saucedo responded, "Yeah, but they can't shoot for shit." The occupants of the car were still in handcuffs at that point. Officer Faiman then asked if Saucedo could describe the people who shot at him. Saucedo refused to talk to Officer Faiman further, and stated he knew who it was, but was not going to tell Officer Faiman. At the point at which Saucedo said he was not going to say anything else, Saucedo seemed upset. At some point, Officer Faiman discovered that Saucedo had a warrant for his arrest.

At argument at the hearing, the prosecutor stated he wanted to have admitted the statements given to the officers based on the question of what happened. "Each officer made the same question to each of the witnesses, what happened, and were provided a statement, so we would ask that at least the initial what happened and response be admitted under the spontaneous declaration exception and that includes also their demeanor.  The fact that a shooting had just happened. It's a relatively short period of time."

Codefense counsel argued, "[T]hese statements were, were given or taken however you want to look at it after the scene was secured, after the people were out of the vehicles. They were being detained, but any danger was gone. [¶] They had time to put these people down on the curb. Look through the vehicle. One of them was even put in the back of a patrol car and while that officer was getting his information [they were] asking what happened. And so it's more of a situation where an officer is doing an investigation and just getting information. It's not these people blurting out statements spontaneously. They're being questioned, and they're giving answers." Defense counsel conceded that the initial statements "Hey, we're the victims" might be admissible, but "anything after that they're just being questioned and we just don't let those statements in."

Appellant's counsel joined in these comments. She agreed that the statements made by the person sticking his hands out the window were spontaneous "but thereafter it does appear this is an ongoing investigation and I would ask the court not to allow the statements in."

The trial court stated:

> "Well what I am focusing on is whether or not these statements were made in response to what happened. I mean these people are in car. The car has just been shot at. Within moments of the car being shot at, we have the stop and the officer coming out. They're talking to these individuals who say, "Hey, we're, we're the victims here," clearly in my mind focusing on the mental state of the speaker and the nature of what happened. [¶] All these responses were following the officer's question about what just happened, trying to find out what's going on. They're all saying the same thing. They're all excited, all nervous, and rightly so after just being in a vehicle that was subjected to gunfire. I think it's a classic case of excited utterance. [¶] ... I find they're all acceptable pursuant to the spontaneous utterance exception to the hearsay rule and I'll allow them all in."

 Later, after testimony at trial of some of the officers and after a lunch break, codefense counsel stated he did not object to the testimony "because the court already ruled on that, but I just wanted to make it clear on the record that we are objecting to all of those statements...." The trial court stated, "You objected. We had the 402.... It goes without saying you're not agreeing that this should come in." The court stated it would note a continuing objection by both defendants to any statements made by the occupants of the Maxima on a hearsay basis, and that the objections were overruled on the basis of the excited utterance exception to the hearsay rule.

**B. The Spontaneous Statement Exception to the Hearsay Rule**

The hearsay rule is codified in Evidence Code section 1200, which states:

10

"(a) 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] (b) Except as provided by law, hearsay evidence is inadmissible. [¶] (c) This section shall be known and may be cited as the hearsay rule ."

One of the exceptions "provided by law" (Evid.Code, § 1200, subd. (b)) is the spontaneous statement exception codified in Evidence Code section 1240, which states:

"Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception."

"The foundation for this exception is that if the declarations are made under the immediate influence of the occurrence to which they relate, they are deemed sufficiently trustworthy to be presented to the jury. [Citations.] [¶] The basis for this circumstantial probability of trustworthiness is 'that in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expressions of one's actual impressions and belief.'" (Showalter v. Western Pacific R.R. Co. (1940) 16 Cal.2d 460, 468; in accord, see also People v. Poggi (1988) 45 Cal.3d 306, 318 (Poggi).) For such a statement or utterance to be admissible, "(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it. [Citation.]" (Showalter, supra, 16 Cal.2d at p. 468; in accord, see also People v. Washington (1969) 71 Cal.2d 1170, 1176; Poggi, supra, 45 Cal.3d 306, 318; People v. Gutierrez (2009) 45 Cal.4th 789, 809–810; and People v. Lynch (2010) 50 Cal.4th 693, 751–752.)

Important to this appeal is the principle that "[n]either lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance. [Citations.]" (People v. Washington, supra, 71 Cal.2d at pp. 1176–1177; People v. Vines (2011) 51 Cal.4th 830, 880.) Thus, asking the declarant "What happened?" does not automatically deprive the declarant's answer of the spontaneity required for that answer to be deemed a spontaneous declaration. "In one sense, a 'spontaneous' utterance is one that is voluntary and is initiated by, or at least not elicited from, the speaker.... [¶] But 'spontaneous' may also be used in a slightly different sense: to describe actions undertaken without deliberation of reflection. This is what is intended by Evidence Code section 1240, which codifies the earlier common law exception to the hearsay rule. [Citation.] ... [¶] The crucial element in determining whether a declaration is sufficiently reliable to be admissible under this exception to the hearsay rule is thus not the nature of the statement but the mental state of the speaker. The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant. The fact that a statement is made in response to questioning is one factor suggesting the answer may be the product of deliberation, but it does not ipso facto deprive the statement of spontaneity. Thus, an answer to a simple inquiry has been held to be spontaneous. [Citations.] More detailed questioning, in contrast, is likely to deprive the response of the requisite spontaneity. [Citations.] But ultimately each fact pattern must be considered on its own merits, and the trial court is vested with reasonable discretion in the matter. [Citation.]" (People v. Farmer (1989) 47 Cal.3d 888, 903–904; People v. Vines, supra, at p. 880.)

"We review a trial court's ruling admitting statements as spontaneous for abuse of discretion. [Citation.] [¶] Because the second admissibility requirement, i.e., that the statement was made

before there was '"time to contrive and misrepresent," ''relates to the peculiar facts of the individual case more than the first or third does [citations], the discretion of the trial court is at its broadest when it determines whether this requirement is met.' [Citation.] In considering admissibility under this requirement, the court considers a variety of factors to determine the mental state of the declarant. [Citation.] These factors include the length of time between the startling occurrence and the statement, whether the statement was blurted out or made in response to questioning, how detailed the questioning was, whether the declarant appeared excited or frightened, and whether the declarant's 'physical condition was such as would inhibit deliberation.' [Citations.]" (<u>People v. Lynch, supra</u>, 50 Cal.4th at p. 752.)

**C. Analysis**

No one disputes the admissibility of Saucedo's volunteered statement to Officer Faiman "that he was the victim and that they had just been shot at."  It is the rest of what Saucedo said to Faiman—particularly the statements that a "subject that was in the passenger seat of the brown vehicle started blasting on him," that "blasting" meant "someone shooting at his [Saucedo's] vehicle," and, in response to Faiman's question as to whether the shooters were possibly northern gang members, "Yeah, but they can't shoot for shit," that appellant contends were improperly admitted into evidence.

As for the time elapsed between the shooting and the statements, Faiman testified that about two minutes passed between the time he heard shot shots fired and the time he stopped the Maxima. About five additional minutes elapsed between the time he stopped the Maxima and the time he asked Saucedo "what happened[?]"  During this time "probably three or four" other officers arrived to assist Faiman. Rodriguez, Saucedo and Stephanie G. were removed from the Maxima at gunpoint, and were handcuffed and checked for weapons. Faiman testified that the officers also checked the Maxima for weapons and were "getting names, birthdays, getting identifying information on these people to figure out who they are."  Faiman learned that Saucedo had a warrant for his arrest.

As for Saucedo's physical condition, Faiman said that Saucedo "was obviously upset" and "[h]e was kind of rocking in a rocking motion as to being upset and he just seemed real nervous and excitable."  At this point, Saucedo was sitting either on a curb or in the back of a patrol car.  He and Rodriguez and Stephanie G. were "being detained."  After Saucedo made the statements he made, Faiman asked Saucedo if he could describe the people who shot at him. Saucedo "pretty much refused to talk to me any further and said he, he knew who it was but he wasn't gonna tell me."

One could view this state of affairs as Saucedo's "reflective powers" predominating over his nervous excitement, and could view his statements as those of a man calculating what to say to the police and what not to say.  One could also reasonably view any nervous excitement on Saucedo's part as stemming not from the shooting but rather from the fact that he was stopped and detained by the police and he knew there was a warrant out for his arrest. Also perhaps supporting this view was Stephanie G.'s testimony that as the Maxima was being pulled over she asked Saucedo "What do I say?" and Saucedo told her to say that they had been going to cash a check.  Stephanie G. did in fact tell Detective Guzman, about two hours after the shooting, that they had been going to cash a check. According to Stephanie G.'s trial testimony, this was not true, and they had in fact just been going to get gas. This particular testimony of Stephanie G. was not presented to the court until after the court had made its ruling on the admissibility of Saucedo's statements.

The evidence could also be viewed, however, as the trial court apparently did, as evidence that Saucedo's nervous excitement predominated over his reflective powers until the point in time at which Faiman asked Saucedo if Saucedo could describe his attackers. At that point Saucedo's reflective powers predominated, and from then on he refused to speak further to Faiman. Given

12

the fact that the trial court's discretion is "'at its broadest'" in making this determination (People v. Lynch, supra, 50 Cal.4th at p. 752; Poggi, supra, 45 Cal.3d at p. 319), we cannot conclude that the court abused that discretion here. "Where, as here, a discretionary power is inherently or by express statute vested in the trial judge, his or her exercise of that wide discretion must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice." (People v. Jordan (1986) 42 Cal.3d 308, 316.) Appellant argues that being shot at several times would not be such a startling occurrence as to suspend the reflective powers of a 28–year–old gang member such as Saucedo, who was "undoubtedly jaded to criminal behavior such as shootings like the instant one." The trial court was not required to agree. We also note that two of the bullet holes in the Maxima were in the left rear door of the four-door Maxima, and that it was Saucedo who had been sitting in the back seat of the Maxima.

**D. Any Error Was Harmless**

"It is ... well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice. (Evid.Code, §§ 353, subd. (b), 354.) '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' (People v. Watson (1956) 46 Cal.2d 818, 836....)" (People v. Richardson (2008) 43 Cal.4th 959, 1001.)

Even if our conclusion that the court did not err in admitting Saucedo's statements is incorrect, any error in the admission of those statements would be harmless error. Appellant argues that the only person who claimed he saw an occupant of the Cougar fire at the Maxima was Saucedo. In fact, as we shall explain, a fair reading of the trial testimony shows all three occupants of the Maxima said or clearly implied that the shots were fired from the Cougar. So even if Saucedo's statements were to be excluded, the remaining evidence was that the shots were fired from the Cougar. That remaining evidence was also uncontradicted.

The other two occupants of the Maxima were Irving Rodriguez and Stephanie G. Rodriguez at first refused to testify and was held in contempt. He then changed his mind and decided to testify. His testimony was clearly reluctant, and largely contradicted a statement he had given to Detective Guzman only hours after the shooting. At trial, he did say that he was a member of the "Wicked Ass Surenos" gang, and further said that he was driving the Maxima when the shots were fired. His description at trial of the shooting was:

> "I noticed that there was a stop coming up, so I had to, you know, I had to make a stop and, you know, as a safe driver I always look at all mirrors, you know, all ways before I cross the intersection and the only funny thing that I noticed was that there was a couple guys running across the street on my left-hand side, not running, like not, not doing the [crosswalk]. They were running across the street towards where I was at. And that's when I heard shots fired, you know, so I sped off and there was another car behind us that sped off too. And after that I got pulled over and the rest of the story unfolds on its own."

Rodriguez was then impeached with the statement he had given to Detective Guzman. Guzman testified that he met with Rodriguez "approximately an hour or so after the shooting." At that time, Rodriguez gave him the following story. Rodriguez was pumping gas into the Maxima, and as he did so, three "Northerners" standing outside of their car were "mad dogging" him and Juan Saucedo. When Rodriguez left the gas station, the three Northerners followed him in a silver or gold-colored Cougar. When Rodriguez was heading north on R Street and stopped at a stop sign at Cedar Street, "the Cougar that was behind them came along on the driver's side and shots were fired." Rodriguez told Guzman he "believed it happened because of him and his

13

friend were southern gang members and the other subjects were Norteno gang members." There was no mention in the statement of Rodriguez having seen anyone on foot. After Rodriguez gave Guzman descriptions of the three "mad dogg[ers]," Guzman met with Rodriguez a second time about an hour later and Rodriguez identified "within a couple seconds" a picture of Larios in a photo lineup shown to him by Guzman. The clear implication of the statement is that the shots were fired from the Cougar, and clearly Rodriguez would not have been identifying a person from the Cougar (Larios) if he were of the view that the shots had been fired from somewhere other than the Cougar.

Stephanie G.'s testimony about the shooting was that "we get to the first stop sign and all I know is that Cougar comes on the side of us and shoots at us." She testified that she was positive the Cougar was the same Cougar they had seen at the gas station. She also identified appellant as the man from the Cougar who went inside the store to pay, and appellant is clearly identifiable on the store surveillance video, as are Saucedo and the two vehicles. The Cougar was registered to Larios.

Officer Bill Robertson spoke to Stephanie G. about 15 minutes after the shooting. Stephanie G. was pregnant at the time of the shooting, so she was transported from the scene of the Maxima vehicle stop to Tulare District Hospital. Robertson testified that he "followed the ambulance to get her statement."  He further testified: "She told me that they were parked at pump 13 at [the convenience store] which is located at Bardsley and Blackstone. She said at this time a car, which was a silver or gray Cougar, pulled up alongside the left-hand side, the driver's side of her vehicle and they exchanged dirty looks with herself and the occupants of the [other] car. [¶] ... [¶] ... She said that they stopped at Cedar and R, the stop sign, and at this time the same vehicle pulled alongside the driver's side and she heard one boom. T hen she sunk down underneath too because she was afraid of getting shot and then she heard four additional shots after that." Robertson clarified that by "the same vehicle" he meant the Cougar from the convenience store.  Again, there was no mention of any individuals on foot.

The defense of both defendants was that because Officer Faiman saw the Maxima, but not the Cougar, shortly after the shots were fired, the Cougar was not there, and someone else did the shooting. The jury apparently concluded that the Cougar simply turned either right or left onto Cedar as it sped away and was out of Faiman's view by the time he saw the Maxima. No alibi witness was called for the defense. Three defense witnesses were called at trial.  One was Ms. Ochoa, who said she saw either one, two, or three kids running in an alley located north of Cedar and east of R Street shortly after she heard shots fired. She did not testify to seeing any weapons. One was an investigator who made some measurements on R Street and a video of the scene to be used in support of the defense argument that Officer Faiman should have seen the Cougar at the intersection of Cedar and R Streets if the Cougar had in fact been there. The third was Detective Guzman, who was re-called by the defense to testify that the scene of the shooting was Norteno territory and that there have been other shootings in the area.

In sum, there was no testimony by any witness that anyone fired a gun from anywhere other than the Cougar. There is no reasonable probability that appellant would have obtained a better result if Saucedo's statements to Officer Faiman had not been admitted into evidence.

(LD 17, pp. 10-21).

    2. Analysis.

    Respondent contends that, as framed and presented herein, Petitioner's claim raises only issues

of state law that do not support a claim of federal habeas relief.  The Court agrees.

    The basic scope of habeas corpus is prescribed by statute. Subsection (c) of Section 2241 of

14

1   Title 28 of the United States Code provides that habeas corpus shall not extend to a prisoner unless he

2   is "in custody in violation of the Constitution." 28 U.S.C. § 2254(a) states that the federal courts shall

3   entertain a petition for writ of habeas corpus only on the ground that the petitioner "is in custody in

4   violation of the Constitution or laws or treaties of the United States. See also, Rule 1 to the Rules

5   Governing Section 2254 Cases in the United States District Court. The Supreme Court has held that

6   "the essence of habeas corpus is an attack by a person in custody upon the legality of that custody . . ."

7   Preiser v. Rodriguez, 411 U.S. 475, 484 (1973). Furthermore, in order to succeed in a petition pursuant

8   to 28 U.S.C. § 2254, Petitioner must demonstrate that the adjudication of his claim in state court

9   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

10  established Federal law, as determined by the Supreme Court of the United States; or resulted in a

11  decision that was based on an unreasonable determination of the facts in light of the evidence presented

12  in the State court proceeding. 28 U.S.C. § 2254(d)(1), (2).

13          On this issue, Petitioner does not allege a violation of the Constitution or federal law, nor does

14  he argue that he is in custody in violation of the Constitution or federal law as a result of the trial

15  court's purportedly erroneous determination regarding the application of the spontaneous utterance

16  exception to the hearsay rule. Petitioner does not allege that the adjudication of his claims in state court

17  "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

18  established Federal law, . . . or resulted in a decision that was based on an unreasonable determination

19  of the facts . . . ." 28 U.S.C. § 2254.  Petitioner raises only a state law claim, and, generally, issues of

20  state law are not cognizable on federal habeas review.  Estelle v. McGuire, 502 U.S. 62, 67 (1991)("We

21  have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'"), quoting

22  Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-349

23  (1993)(O'Connor, J., concurring)("mere error of state law, one that does not rise to the level of a

24  constitutional violation, may not be corrected on federal habeas").   Moreover, "[c]onclusory

25  allegations which are not supported by a statement of specific facts do not warrant habeas relief." James

26  v. Borg, 24 F.3d 20, 29 (9th Cir.1994).

27          Indeed, federal courts are bound by state court rulings on questions of state law. Oxborrow v.

28  Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), cert. denied, 493 U.S. 942 (1989). Further, "the availability

of a claim under state law does not of itself establish that a claim was available under the United States Constitution." <u>Sawyer v. Smith</u>, 497 U.S. 227, 239 (1990), *quoting,* <u>Dugger v. Adams</u>, 489 U.S. 401, 409 (1989). <u>Tinsley v. Borg</u>, 895 F.2d 520, 530 (9th Cir.1990), *cert. denied,* 498 U.S. 1091 (1991) ("incorrect" evidentiary rulings are not the basis for federal habeas relief).

As Respondent notes, the 5th DCA's decision rests entirely on state law.  Moreover, the petition for review filed in the California Supreme Court cites only state law as grounds for error based on admission of the spontaneous utterance.  (LD 18, pp. 7-10).  As discussed, this Court is bound by the state court's ruling regarding its interpretation of its own evidentiary rules.  <u>Oxborrow v. Eikenberry</u>, 877 F.2d at 1399.

However, in the petition for review, Petitioner also contends that the error was prejudicial because Saucedo's hearsay statement was the only testimony that assailants in the Cougar fired at the victim's car, and therefore, under <u>Chapman v. California</u>, 386 U.S. 18 (1967), reversal was required. (LD 18, p. 11).  The Ninth Circuit has considered similar contentions and concluded that the issue of whether a statement fits within the state's own spontaneous utterance exception does not raise a claim for which habeas relief is available, although if the claim is considered under the confrontation clause, habeas relief may be available:

> Of course, Winzer could not obtain federal habeas relief on the grounds that the California courts wrongly found that his statement fit within California's spontaneous statement exception to hearsay. State court rulings on the admissibility of evidence generally fall outside the scope of federal habeas relief, which is designed only to remedy violations of federal law. <u>See</u> 28 U.S.C. § 2254(a); <u>Burgett v. Texas</u>, 389 U.S. 109, 113-14, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967). The California Supreme Court is the highest authority on the interpretation and application of California law. <u>See, e.g., Estelle v. McGuire</u>, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions."); <u>Wisconsin v. Mitchell</u>, 508 U.S. 476, 483, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993) ("There is no doubt that we are bound by a state court's construction of a state statute.").

> But where a Confrontation Clause violation is alleged, federal courts can go beyond a state court's characterization and analyze whether a factual basis supports the state court's decision. In <u>Paxton v. Ward</u>, 199 F.3d 1197, 1207-11 (10th Cir.1999), the Tenth Circuit applied AEDPA and held that the state court made an unreasonable determination of the facts when it found that the statement in question was an excited utterance for purposes of the Confrontation Clause. [Footnote]  Paxton noted that "[t]he Supreme Court has rejected the argument that a state court determination admitting hearsay under state law is dispositive of a petitioner's habeas claim that his constitutional confrontation rights were violated by the admission." 199 F.3d at 1208 (citing <u>Lee v. Illinois</u>, 476 U.S. 530, 539, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986)). Further, Paxton relied on the Lee decision not merely to say that hearsay falling under the second prong of Roberts must be supported by particularized guarantees of trustworthiness, but to say that a

federal habeas court must consider whether a hearsay statement actually does fall within a firmly rooted exception under the first prong of <u>Roberts</u>-even if the state court has already determined that it does.

The question here does not end with the California courts' determination that Parrish's report to Dickson was "spontaneous."  The issue falls under the Confrontation Clause: did the admission of Winzer's threat to Parrish through Dickson's testimony violate Winzer's right to confront Parrish? If the circumstances surrounding Parrish's report of the statement to Dickson fit the Supreme Court's descriptions of the excited utterance or spontaneous declaration exception to hearsay, as set forth in <u>Wright</u> and <u>White</u>, then the Confrontation Clause was not violated. If the circumstances do not fit those characterizations, then admission of the statement violated the Confrontation Clause. Once content is imputed to the category of spontaneous statements, it becomes impossible to rely exclusively on the label the state courts attach to the statement in question.

In sum, even under AEDPA, we cannot avoid the question of whether a hearsay statement falls within a firmly rooted exception to hearsay and so complies with the Confrontation Clause.

<u>Winzer v. Hall</u>, 494 F.3d 1192, 1198-1199 (9th Cir. 2007).

Where a state court admits a spontaneous utterance under a state exception to the hearsay rule, this Court has been unable to locate any "clearly established" federal authority supporting a federal due process violation <u>independent of</u> a confrontation clause question.   A habeas petitioner "bears a heavy burden in showing a due process violation based on an evidentiary decision." <u>Boyde v. Brown</u>, 404 F.3d 1159, 1172 (9th Cir.2005). Indeed, the Ninth Circuit has observed:

Under AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by "clearly established federal law," as laid out by the Supreme Court. 28 U.S .C. § 2254(d). In cases where the Supreme Court has not adequately addressed a claim this court cannot use its own precedent to find a state court ruling unreasonable. Musladin, 549 U.S. at 77, 127 S.Ct. 649, 166 L.Ed.2d 482.

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process. Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, <u>see Williams</u>, 529 U.S. at 375, 120 S.Ct. 1495, 146 L.Ed.2d 389, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ. Absent such "clearly established Federal law," we cannot conclude that the state court's ruling was an "unreasonable application." <u>Musladin</u>, 549 U.S. at 77, 127 S.Ct. 649, 166 L.Ed.2d 482.

<u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir.2009).  Petitioner's evidentiary admission claim is not cognizable under AEDPA because there are no Supreme Court decisions "clearly establishing" that the erroneous admission of spontaneous statements as exceptions to the hearsay rule violates due process.  To the extent that Petitioner argues a confrontation clause violation, habeas relief may be appropriate under certain narrow circumstances.  Thus, the Court will now turn to that question.

17

1    B.  <u>Confrontation Clause Claim</u>.

2        Petitioner next contends that admission of Saucedo's statement to Officer Faiman violated

3    Petitioner's Sixth Amendment Confrontation Clause rights.  This contention is also without merit.

4        1.  <u>The 5th DCA's Opinion</u>.

5    The 5th DCA rejected Petitioner's claim as follows:

6    The Sixth Amendment to the United States Constitution provides that "[i]n all criminal
     prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against
7    him...." The protection provided by this confrontation clause has been held to be applicable to
     both federal and state prosecutions. (<u>Pointer v. Texas</u> (1965) 380 U.S. 400, 406.)  Appellant
8    argues that he was denied the right to confront a witness against him because the statements
     Saucedo made to Officer Faiman were admitted into evidence under the spontaneous statement
9    exception to the hearsay rule, but Saucedo never testified at trial and appellant never had an
     opportunity to cross-examine Saucedo. We reject this contention for three reasons.

10
11   First, appellant has not preserved this contention for appeal because he made no confrontation
     clause objection in the trial court. When a defendant objects on hearsay grounds to the
12   admission of evidence, but does not also raise a confrontation clause objection, and the trial
     court properly admits that evidence under the hearsay exception, the defendant cannot argue on
13   appeal that the evidence properly admitted under the hearsay exception nevertheless violates the
     confrontation clause.  (<u>People v. Loy</u> (2011) 52 Cal.4th 46, 66, fn. 3; <u>see also People v. Redd</u>
14   (2010) 48 Cal.4th 691, 730.)

15   Second, even if we were to address the argument on its merits, it would fail. In <u>Crawford v.
     Washington</u> (2004) 541 U.S. 36, the court held that the confrontation clause permits admission
16   into evidence "[t]estimonial statements of witnesses absent from trial ... only where the
     declarant is unavailable, and only where the defendant has had a prior opportunity to cross-
17   examine."  (<u>Id</u>. at p. 59; in accord, see also Bullcoming v. New Mexico (2011) ——U.S. ——,
     [131 S.Ct. 2705, 2706–2707].)  "Where nontestimonial hearsay is at issue, it is wholly
18   consistent with the Framers' design to afford the States flexibility in their development of
     hearsay law ... Where testimonial evidence is at issue, ... the Sixth Amendment demands what
19   the common law required: unavailability and a prior opportunity for cross-examination. We
     leave for another day any effort to spell out a comprehensive definition of 'testimonial.'
20   Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary
     hearing, before a grand jury, or at a former trial; and to police interrogations." (<u>Crawford, supra</u>,
     541 U.S. at p. 68, fn omitted.)
21
     "Another day" came two years later in <u>Davis v. Washington</u> (2006) 547 U.S 813, where the
22   court stated: "Without attempting to produce an exhaustive classification of all conceivable
     statements—or even all conceivable statements in response to police interrogation—as either
23   testimonial or nontestimonial, it suffices to decide the present cases to hold as follows:
     Statements are nontestimonial when made in the course of police interrogation under
24   circumstances objectively indicating that the primary purpose of the interrogation is to enable
     police assistance to meet an ongoing emergency. They are testimonial when the circumstances
25   objectively indicate that there is no such ongoing emergency, and that the primary purpose of
     the interrogation is to establish or prove past events potentially relevant to later criminal
26   prosecution." (<u>Id</u>. at p. 822, fn. omitted.)

27   In <u>Michigan v. Bryant</u> (2011) —— U.S. ——, [131 S.Ct. 1143], police responded to a radio
     dispatch indicating that a man had been shot.  They found the victim, Covington, who had a
28   gunshot wound to the abdomen, and asked him "'what happened?'" (<u>Id</u>. at p. 1163.) "The

answer was either 'I was shot' or 'Rick shot me.'" (Ibid., fn. omitted.)  The victim ultimately died, and "Rick" was convicted of second degree murder. The convicted defendant argued that the victim's statements were testimonial and should not have been admitted into evidence. The United States Supreme Court disagreed. The court concluded that the circumstances objectively indicated that the primary purpose of the interrogation was to enable the police to meet an ongoing emergency, and not to establish or prove past events potentially relevant later to criminal prosecution. "[T]he police responded to a call that a man had been shot.... [T]hey did not know why, where, or when the shooting had occurred.  Nor did they know the location of the shooter or anything else about the circumstances in which the crime occurred.  The questions they asked—'what had happened, who had shot him, and where the shooting occurred,' [citation]—were the exact type of questions necessary to allow the police to '"assess the situation, the threat to their own safety, and possible danger to the potential victim"' and to the public, [citations], including to allow them to ascertain 'whether they would be encountering a violent felon,' [citation].  In other words, they solicited the information necessary to enable them 'to meet an ongoing emergency.' [Citation.]" (Id. at pp. 1165–1166, fns. omitted.) "Because the circumstances of the encounter as well as the statements and actions of Covington and the police objectively indicate that the 'primary purpose of the interrogation' was 'to enable police assistance to meet and ongoing emergency,' [citation], Covington's identification and description of the shooter and the location of the shooting were not testimonial hearsay.  The Confrontation Clause did not bar their admission at Bryant's trial." (Id. at pp. 1166–1167.)  In the case presently before us, where the facts are so strikingly similar, we would be hard pressed to reach a different conclusion.

Third, even if appellant had not waived the confrontation clause issue, and even if we were to be incorrect in our conclusion that that Saucedo's statements to Faiman were not testimonial, we are still of the opinion, for the reasons stated in subpart "D" above, that any error in the admission of those statements was harmless beyond a reasonable doubt. (Chapman v. California (1967) 386 U.S. 18.)  Appellant argues that if the admission of the statements was error, it could not be deemed harmless beyond a reasonable doubt because appellant's first trial ended in a mistrial after the jury could not reach a verdict. Appellant argues that absent the introduction of Saucedo's statements to Faiman, the evidence presented in appellant's second trial equally allowed room for reasonable doubt. We are not persuaded. The argument assumes that the evidence presented in the first trial was otherwise the same as was presented in this trial. Although we do not have the transcript of the first trial, we do know from the record on appeal that Rodriguez did not testify at the first trial. In this one, he did, and then was devastatingly impeached by the testimony of Detective Guzman with the statements Rodriguez had made to Guzman very shortly after, and on the same day as, the shooting.  The second jury thus heard statements made, very shortly after the shooting, by all three occupants of the Maxima, all of whom said that the shots were fired from the Cougar.  In the first trial, the jury appears to have had only Stephanie G.'s testimony.  In the second trial, even without Saucedo's statements, the jury still would have had Stephanie G.'s and Rodriguez's accounts of the shooting incident, all of it uncontradicted. We also know that the first trial had three defendants, the third being the alleged third occupant of the Cougar. According to the People's trial brief for the second trial, the case against the alleged third occupant of the Cougar "had to be dismissed" because of the refusal of Saucedo and Rodriguez to testify. The first trial may have differed from this one in other respects as well, but the important point is that whatever doubts the first jury may have had about Stephanie G.'s testimony, the evidence presented in the second trial did not rely on her testimony alone to prove that the shots were fired from the Cougar, and the evidence of guilt in the second trial was strong and uncontradicted.

(LD 17, pp. 21-24).

      2.  Federal Standard.

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the

accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const .,

Amend. VI. The Confrontation Clause bars "admission of testimonial statements of a witness who did

not appear at trial unless he was unavailable to testify, and the defendant ... had a prior opportunity for

cross-examination." Crawford v. Washington, 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177

(2004); Davis v. Washington, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The

Confrontation Clause applies only to "'witnesses' against the accused, i.e., those who 'bear testimony.'"

Crawford, 541 U.S. at 51 (citation omitted); Davis, 547 U.S. at 823–24. "'Testimony,' in turn, is

typically a solemn declaration or affirmation made for the purpose of establishing or proving some

fact." Crawford, 541 U.S. at 51 (citation and some internal punctuation omitted); Davis, 547 U.S. at

824. As the Davis court explained:

> [a] critical portion of [Crawford's ] holding ... is the phrase "testimonial statements." Only
> statements of this sort cause the declarant to be a "witness" within the meaning of the
> Confrontation Clause. It is the testimonial character of the statement that separates it from
> other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject
> to the Confrontation Clause.

Davis, 547 U.S. at 821 (citation omitted)(emphasis supplied).  Thus, nontestimonial statements do not

implicate the Confrontation Clause.  Giles v. California, 554 U.S. 353, 376 (2008).  Moreover, the

Confrontation Clause "does not bar the use of testimonial statements for purposes other than

establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n. 9. Additionally, a

Confrontation Clause violation is subject to harmless error analysis. Delaware v. Van Arsdall, 475

U.S. 673, 684 (1986). A Confrontation Clause violation is harmless, and does not justify habeas relief,

unless it had substantial and injurious effect or influence in determining the jury's verdict. Brecht v.

Abrahamson, 507 U.S. 619, 623 (1993).

        "Although Crawford did not define 'testimonial' or 'nontestimonial,' it made clear that the

Confrontation Clause was concerned with 'testimony,' which 'is typically [a] solemn declaration or

affirmation made for the purpose of establishing or proving some fact,' and noted that '[a]n accuser

who makes a formal statement to government officers bears testimony in a sense that a person who

makes a casual remark to an acquaintance does not.'" Delgadillo v. Woodford, 527 F.3d 919, 927 (9th

Cir.2008) (quoting Crawford, 541 U.S. at 51).  Subsequent Supreme Court cases have suggested that a

statement is "testimonial" if its declarant knew, or should have known, that its primary utility was to

1   provide evidence of the defendant's unlawful conduct for use in his prosecution or a criminal

2   investigation into past events. See Williams v. Illinois, —–U.S. —–,132 S.Ct. 2221, 2242, 183 L.Ed. 2d

3   89 (2012) ("The abuses that the Court has identified as prompting the adoption of the Confrontation

4   Clause shared the following two characteristics: (a) they involved out-of-court statements having the

5   primary purpose of accusing a targeted individual of engaging in criminal conduct and (b) they

6   involved formalized statements such as affidavits, depositions, prior testimony, or confessions.");

7   Melendez–Diaz v. Massachusetts, 557 U.S. 305 (2009) (opining that a statement is "testimonial" if it

8   was made for an "evidentiary purpose" and "under circumstances which would lead an objective

9   witness reasonably to believe that the statement would be available for use at a later trial") (internal

10   citation and quotation marks omitted).

11                  3.   Analysis.

12                        a.   Procedural Bar.

13          Respondent first argues that Petitioner's confrontation clause argument is procedurally barred

14   because the purported error was not preserved at trial by a contemporaneous objection, as evidenced by

15   the 5th DCA's rejection of the claim as procedurally defaulted.  The Court agrees.

16          State courts may decline to review a claim based on a procedural default. Wainwright v. Sykes,

17   433 U.S. 72, 86–87 (1977).  Federal courts "will not review a question of federal law decided by a state

18   court if the decision of that court rests on a state law ground that is independent of the federal question

19   and adequate to support the judgment."  Coleman v. Thompson, 501 U.S. 722, 729, 111 S.Ct. 2546

20   (1991); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001); see Ylst v. Nunnemaker, 501 U.S. 797,

21   801 (1991); Park v. California, 202 F.3d 1146, 1150 (2000) ("A district court properly refuses to reach

22   the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural

23   requirements . . . ."); see also Fox Film Corp. v. Muller, 296 U.S. 207, 210 (1935).  This concept has

24   been commonly referred to as the procedural default doctrine.  This doctrine of procedural default is

25   based on concerns of comity and federalism.  Coleman, 501 U.S. at 730-32.  If the court finds an

26   independent and adequate state procedural ground, "federal habeas review is barred unless the prisoner

27   can demonstrate cause for the procedural default and actual prejudice, or demonstrate that the failure to

28   consider the claims will result in a fundamental miscarriage of justice."  Noltie v. Peterson, 9 F.3d 802,

21

804-805 (9th Cir. 1993); Coleman, 501 U.S. at 750; Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

For the procedural default doctrine to apply and thereby bar federal review, the state court determination of default must be grounded in state law that is both *adequate* to support the judgment and *independent* of federal law. Ylst, 501 U.S. at 801; Coleman, 501 U.S. at 729-30; see also Fox Film Corp., 296 U.S. at 210. "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001) (*citing* Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)); Morales v. Calderon, 85 F.3d 1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred if the state decision 'fairly appears to rest primarily on federal law, or to be interwoven with federal law.'" (*quoting* Coleman, 501 U.S. at 735). "A state law is so interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed.'" Park, 202 F.3d at 1152 (*quoting* Ake v. Oklahoma, 470 U.S. 68, 75, 105 S.Ct. 1087 (1985)).

To be deemed adequate, the state law ground for decision must be well-established and consistently applied. Poland v. Stewart, 169 F.3d 573, 577 (9th Cir. 1999) ("A state procedural rule constitutes an adequate bar to federal court review if it was 'firmly established and regularly followed' at the time it was applied by the state court.")(*quoting* Ford v. Georgia, 498 U.S. 411, 424 (1991)). Although a state court's exercise of judicial discretion will not necessarily render a rule inadequate, the discretion must entail "'the exercise of judgment according to standards that, at least over time, can become known and understood within reasonable operating limits.'" Id. at 377 (*quoting* Morales, 85 F.3d at 1392).

California law requires that, with certain exceptions, appellate courts will not consider claims of error that could have been but were not raised in the trial court. Peole v. Vera, 15 Cal.4th 269, 275 (1997). That rule has been deemed both independent of federal law, People v. Williams, 16 Cal.4th 153, 208 (1997), and consistently applied. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002). Here, the record establishes, and Petitioner does not dispute, that defense counsel failed to tender a timely objection to the introduction of Saucedo's spontaneous statement to Officer Faiman; hence, the

22

1   state court's determination that the claim has been procedurally defaulted bars federal review in this

2   case.

3                                   b.  Merits

4          As mentioned previously, state court rulings on the admissibility of evidence generally are not

5   within the scope of federal habeas review. Estelle, 502 U.S. at 67-68. Therefore, Petitioner could not

6   obtain federal habeas relief on a claim that the California courts wrongly found that Saucedo's

7   statements to Officer Faiman fell within California's spontaneous statement exception to the hearsay

8   rule.  However, where a petitioner alleges a Confrontation Clause violation, a federal habeas court must

9   independently analyze whether a state court decision that statements fall or do not fall within a firmly

10  rooted exception to the hearsay rule have a factual basis in the record. Winzer, 494 F.3d at 1199 ("in

11  sum, even under AEDPA, we cannot avoid the question of whether a hearsay statement falls within a

12  firmly rooted exception to hearsay and so complies with the Confrontation Clause"). Accordingly, this

13  Court must independently analyze the record to determine whether a sufficient factual basis supports

14  the state court's conclusion that Saucedo's statements to Officer Faiman were spontaneous declarations

15  and therefore not subject to exclusion under the hearsay rule. See Winzer, 494 F.3d at 1199-1201. For

16  the reasons expressed below, the Court believes a sufficient factual basis exists in the record.

17         Here, the state court applied the correct legal standard under the Sixth Amendment by applying

18  Crawford, Davis, and Michigan v. Bryant, 562 U.S. 344 (2010).  Thus, the only question remaining is

19  whether the state court's adjudication is objectively unreasonable.

20         The 5th DCA conducted a thorough examination of the evidence and circumstances described by

21  that evidence at the time of the shooting and the elicitation of Saucedo's spontaneous statements by

22  Faiman immediately thereafter to conclude that the statements were not testimonial and thus not

23  covered by the Sixth Amendment.  To briefly summarize, the state court did not concern itself with

24  Saucedo's statement to Faiman that "he [Saucedo] was the victim and that they had just been shot at,"

25  but instead focused only on the statements that an individual in the passenger seat of the brown vehicle

26  shot at him and that the individual was a member of a rival gang.  The chronology of events strongly

27  suggests that, during the initial encounters with Faiman, which occurred shortly after the shooting took

28  place, Saucedo was "upset," "nervous," and "excitable."   After several more minutes had passed,

during which officers were attempting to elicit basic information such as names, birthdates, and identifying information, Saucedo refused to cooperate further with Faiman. The 5th DCA construed this to be the point at which the initial "excitement" of Saucedo's original utterances to Faiman had worn off and Saucedo's "reflective powers" had engaged such that he had begun to "calculate" what to say to police and what not to say. The 5th DCA viewed that point as the cut-off point after which the excited utterance exception would no longer apply.

The Court's review of the 5th DCA's legal analysis reveals no obvious shortcomings. Rather, the analysis appears to be amply supported by evidence in the record. Hence, the state court findings and legal determination regarding the applicability of the excited utterance rule should be upheld.

Turning to the issue of the confrontation clause claim, the 5th DCA relied upon Davis, which explained that "[s]tatements are nontestimonial when made in the court of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." Davis, 547 U.S. at 822. Similarly, in Bryant, upon which the 5th DCA also relied, the Supreme Court concluded that statements from a dying victim to police that "Rick shot me" were nontestimonial because the primary purpose of the interrogation was to enable the police to meet an ongoing emergency, not to establish or prove past events germane to a possible later criminal prosecution. Bryant, 562 U.S. at 374-375.

The 5th DCA concluded that the comments made by Saucedo, which occurred at the outset of Faiman's investigation, were elicited by Faiman for the primary purpose of conducting an initial investigation into what had transpired, to determine if other individuals might be in danger, and whether the individuals who had fired the shots were the individuals Faiman had detained or were persons unknown and still at large and posing a danger to public safety. The Court will not second-guess this reasonable conclusion by the state court. The Court will add only that, at the point when Saucedo made his excited utterances to Faiman, police were still unsure what had happened and who was involved. Indeed, Faiman initially believed that the Saucedo and the others in his car were the perpetrators, rather than the victims. It was only through eliciting such comments as those now challenged by Petitioner that police were able to conclude that Saucedo and his acquaintances were actually the victims and that unknown perpetrators were still at large. Under such circumstances, it is

1    apparent that the primary purpose of questioning Saucedo initially was not to gather information for a

2    future prosecution but simply to secure the scene and assess whether the danger persisted.  As such, the

3    comments were not testimonial and do not invoke the Confrontation Clause.

4        Thus, the state court's analysis applied the correct standard and made a thoughtful analysis of

5    the issue based upon that standard that reach an objectively reasonable conclusion.  That is all that is

6    required under the AEDPA.  As a result, habeas relief should be denied.

7                                    c.  Harmless Error.

8        The Court also agrees with the state court that any error was harmless.  As discussed, the 5th

9    DCA concluded that even if admission of the Saucedo hearsay statements to Faiman were erroneous,

10   the error was harmless beyond a reasonable doubt pursuant to Chapman v. California, 386 U.S. 18

11   (1967).  Under the AEDPA, a constitutional error in a state court criminal trial is assessed under the

12   "substantial and injurious effect" standard set forth in Brecht, 507 U.S. 619, 637, and this is true

13   regardless of whether the state court recognized the error and reviewed it for harmlessness under the

14   "beyond a reasonable doubt" standard of Chapman.  Fry v. Pliler, 551 U.S. 112 (2007).  When the state

15   court applies the Chapman standard, that court's determination is subject to the deferential review

16   afforced by sec. 2254(d)(1).  Because the Brecht test subsumes the sec. 2254(d)(1)/Chapman test, the

17   federal district court need only apply the Brecht test.  Fry, 551 U.S. at 120 ("it certainly makes no sense

18   to require formal application of both tests…when the latter obviously subsumes the former.").

19       The state court concluded that several witnesses at trial could be understood to have testified

20   that the shots were fired from the Cougar in which Petitioner was riding, not from some other car or

21   from unknown pedestrian.  Given this evidence, Saucedo's statement was not the only evidence

22   connecting Petitioner to the crime.  Moreover, the jury was free to reject the defense testimony of Ms.

23   Ochoa, who stated that immediately after the shots were fired, she saw youths running into an alley, or

24   to understand her testimony simply as youths running away from the perceived danger.  Simply put,

25   there is no credible direct evidence that anyone other than riders in the Cougar fired shots at the

26   victims.  Accordingly, Saucedo's testimony was cumulative and its admission did not have a substantial

27   and injurious effect on the verdict.

28   ///

25

C.  Ineffective Assistance Of Counsel.

Next, Petitioner claims that he was denied the effective assistance of counsel when his attorney

failed to object to the admission of Saucedo's statement to Officer Faiman.

1.  The 5th DCA's Opinion.

The 5th DCA rejected Petitioner's claim as follows:

> "'Every person accused of a criminal offense is entitled to constitutionally adequate legal
> assistance." (People v. Pope (1979) 23 Cal.3d 412, 424 ...; see also People v. Ledesma (1987)
> 43 Cal.3d 171, 215 (Ledesma).)  To establish a claim of inadequate assistance, a defendant must
> show counsel's representation was 'deficient' in that it 'fell below an objective standard of
> reasonableness .... [¶] ... under prevailing professional norms.'  (Strickland [v. Washington
> (1984)] 466 U.S. [668,] 688; In re Jones (1996) 13 Cal.4th 552, 561.)  In addition, a defendant
> is required to show he or she was prejudiced by counsel's deficient representation. (Strickland,
> supra, 466 U.S. at p. 688; Ledesma, supra, 43 Cal.3d at p. 217 .)  In determining prejudice, we
> inquire whether there is a reasonable probability that, but for counsel's deficiencies, the result
> would have been more favorable to the defendant. (Strickland, supra, 466 U.S. at p. 687; In re
> Sixto (1989) 48 Cal.3d 1247, 1257.)"  (People v. Frye (1998) 18 Cal.4th 894, 979, disapproved
> on another ground in People v. Doolin (2009) 45 Cal.4th 390, 421; in accord, see also People v.
> Anderson (2001) 25 Cal.4th 543, 569, and People v. Stewart (2004) 33 Cal.4th 425, 459.)
>
> Appellant contends that he was denied effective assistance of counsel because his trial counsel
> failed to object on Sixth Amendment grounds (as opposed the hearsay objection that trial
> counsel did raise) to the admission of Saucedo's statements to Officer Faiman. This argument
> fails for at least two reasons. First, appellant fails to demonstrate that his trial counsel's
> representation fell below an objective standard of reasonableness under prevailing professional
> norms. As we have explained, Saucedo's statements to Faiman were not "testimonial" and thus
> were not barred by the confrontation clause of the Sixth Amendment. (Michigan v. Bryant,
> supra, 131 S.Ct. 1143). An objection on Sixth Amendment grounds would thus have been
> without merit. Second, as we have also already explained, even if Saucedo's statements were to
> be considered "testimonial," the admission of his statements was harmless beyond a reasonable
> doubt.

(LD 17, pp. 24-25).

2.  Federal Standard.

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth

Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel

are reviewed according to Strickland 's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th

Cir.1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S.

75(1988) (holding that where a defendant has been actually or constructively denied the assistance of

counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is

that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient

1   performance fell below an objective standard of reasonableness under prevailing professional norms.

2   Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, Petitioner must establish that he

3   suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional

4   errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability

5   sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what

6   counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v.

7   Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

8          With the passage of the AEDPA, habeas relief may only be granted if the state-court decision

9   unreasonably applied this general Strickland standard for ineffective assistance.  Knowles v.

10  Mirzayance, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a

11  federal court believes the state court's determination under the Strickland standard "was incorrect but

12  whether that determination was unreasonable–a substantially higher threshold."  Schriro v. Landrigan,

13  550 U.S. 465, 473 (2007); Knowles v. Mirzayance, 556 U.S. ___, 129 S.Ct. at 1420.  In effect, the

14  AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state

15  court determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

16  Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state

17  court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

18  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was

19  unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway

20  courts have in reaching outcomes in case-by-case determinations").

21         Here, the state court identified the appropriate federal standard by applying Strickland.  Thus,

22  the only issue is whether the state court's adjudication, i.e., that defense counsel's representation was

23  neither deficient nor prejudicial, was not contrary to or an unreasonable application of Strickland.  For

24  the reasons discussed below, the Court concludes that it was not.

25                 3.  Analysis.

26         The state court ruled that neither prong of the Strickland standard had been met in this instance.

27  The Court agrees.  First, as the 5th DCA noted, and this Court has already agreed, the state court

28  correctly concluded that Saucedo's comments were not testimonial in nature and were not, therefore,

1    barred by the Confrontation Clause.  Thus, Petitioner's counsel had no legal basis for interposing an

2    objection to the admission of the Saucedo hearsay.  Following this reasoning to its logical conclusion,

3    defense counsel could not have been derelict in his performance for failing to interpose an objection

4    that lacked a valid legal basis.  Moreover, as the 5th DCA concluded, and this Court has already agreed,

5    any error in admitting the Saucedo hearsay was harmless under <u>Brecht</u>; hence, the <u>Strickland</u>

6    "prejudice" prong has not been met either.  In sum, the Court agrees with the state court that neither

7    prong of <u>Strickland</u> was met in this case and therefore the claim should be denied.

8        D.  <u>Error In Admission Of Saucedo Statement To Stephanie G.</u>

9        Next, Petitioner claims that the trial court erred in admitting the statement of Saucedo to

10   Stephanie G.

11        1.  <u>The 5th DCA's Opinion</u>.

12   The 5th DCA rejected Petitioner's claim as follows:

13   Appellant contends the trial court erred in admitting Stephanie G .'s testimony that Saucedo
14   told her that while he was in the store, one of the occupants of the Cougar said to him "What's
     up, Ene[?]" and he responded, "What's up, Ese[?]"

15   Even if we assume, without deciding the issue, that this evidence was improperly admitted, any
     error in admitting the statement was clearly harmless. (<u>See</u> part "I," subpart "D" of this
16   opinion, ante.) As we have already pointed out, the evidence presented at trial included
     statements from all three occupants of the Maxima that shots were fired at them from the
17   Cougar.  Even if we were to assume that Juan Saucedo's statements to Officer Faiman
     (including Saucedo's statement that the Cougar "blasted" him) were improperly admitted, as
18   appellant contends, we are still left with the statements from Rodriguez and Stephanie G. about
     the shooting, about the "mad dogging" at the gas station prior to the shooting, the video
19   showing Saucedo and appellant inside the store together and obviously aware of each other, the
     uncontradicted evidence that the "LA" tattoo on the back of Saucedo's head made him easily
20   identifiable as a gang member (he entered the store ahead of appellant), the lack of any
     testimony from anyone that there was any gun anywhere other than in the Cougar, a lack of
21   any alibi evidence as to where the defendants were when the shots were fired at the Maxima,
     and no attempt from the defense to explain why the Cougar, registered to Larios, was burned 4
22   days after the shooting.

23   Appellant's argument that admission of hearsay evidence of the "Ene ... Ese" exchange
     between him and Saucedo violated his constitutional right to confront the witnesses against
24   him fails because, as we explained in part "I," subpart "E," ante, that Sixth Amendment right
     protects a defendant only from the improper admission of testimonial hearsay. (<u>Crawford v.</u>
25   <u>Washington, supra</u>, 541 U.S. 36.)  A statement made to an acquaintance at a gas station is not
     "testimonial" evidence.  (<u>People v. Griffin</u> (2004) 33 Cal.4th 536, 579; <u>People v. Loy, supra</u>,
26   52 Cal.4th at p. 66.)

27   (LD 17, pp. 25-26).

28   ///

2.  Federal Standard

A previous section discussed the federal standard for a Confrontation Clause challenge.  The analysis that follows will apply that standard to the facts in this record.

3.  Analysis

Here, as the 5th DCA found, Saucedo's informal statement to Stephanie G., made while the two of them were at the gas station after Saucedo had first encountered a rival gang member, were certainly not in any sense testimonial under Crawford. See, e.g., Giles, 554 U.S. at 376 ("Statements to friends and neighbors ... would be excluded, if at all, only by hearsay rules...."); Crawford, 541 U.S. at 51 ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not."); Delgadillo, 527 F.3d at 927 (victim's statements to her coworkers were nontestimonial and did not implicate petitioner's Sixth Amendment right of confrontation). Therefore, "because [Saucedo's] statements to [Stephanie G.] were not 'testimonial,' their admission in [Petitioner's] trial was not precluded by Crawford." Jensen v. Pliler, 439 F.3d 1086, 1090 (9th Cir.2006).

Additionally, the Court agrees with Respondent's argument that even if admission of the excited utterance were erroneous, the error was harmless under Brecht.  The state court characterized the evidence of Petitioner's involvement in the shooting as substantially corroborated by three eyewitnesses and additional circumstantial evidence.  Under those circumstances, it is difficult to see how Saucedo's statement that the two rival gang members exchanged coded messages about their gang affiliations at the gas station could possibly have had a "substantial and injurious effect" on the verdict.  Out of context, the statements were meaningless to lay people not versed in gang protocols. In context, they serve only to reinforce the established fact of respective gang affiliations, something with which the jury was already quite familiar.  Accordingly, the error, if any, would have been harmless under Brecht.

E.  Cumulative Error.

Finally, Petitioner contends that the cumulative effect of all claimed errors violated his federal constitutional right to a fair trial.  This contention must be rejected as well.

///

29

1        1. The 5th DCA's Opinion.

2        The 5th DCA rejected Petitioner's claim as follows:

> An appellate court will "assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence." (People v. Kronemyer (1987) 189 Cal.App.3d 314, 349; People v.. Williams (2009) 170 Cal. App.4th 587, 646; see also People v. Zerillo (1950) 36 Cal.2d 222, 233; People v. Holt (1984) 37 Cal.3d 436, 459; People v. Hill (1998) 17 Cal.4th 800, 844–845; and People v. Rogers (2006) 39 Cal.4th 826, 911.)  Absent such a reasonable probability (see People v. Watson, supra, 46 Cal.2d at p. 836), there has been no miscarriage of justice, and the defendant has not been deprived of a fair trial and thus has not been deprived of due process of law. (People v. Kronemyer, supra, 189 Cal.App.3d 314; People v. Williams, supra, 170 Cal.App.4th 587.) Appellant contends that the cumulative effect of the purported errors addressed in parts "I" through "III" above deprived him of a fair trial. As we have explained, those contentions of error are without merit. Also, for the reasons we have already explained above, even if appellant's contentions of error had merit, the cumulative prejudicial effect of the presumed errors was harmless under any standard.

(LD 17, pp. 26-27).

        2. Federal Standard.

     The cumulative prejudicial effect of multiple trial errors must be considered in determining whether habeas relief is warranted.  28 U.S.C. § 2254.  Phillips v. Woodford, 267 F.3d 966, 985 (9th Cir. 2001).  Here, however, as discussed above, there are no constitutional errors to accumulate.  See Villafuerte v. Stewart, 111 F.3d 616, 632 (9th Cir. 1997)(per curiam).  In analyzing prejudice in a case in which it is questionable whether any "single trial error examined in isolation is sufficiently prejudicial to warrant reversal," the Ninth Circuit has recognized the important of considering the "cumulative effect of multiple errors" and not simply conducting a "balkanized, issue-by-issue harmless error review."  United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996); see also Whelchel v. Washington, 232 F.3d 1197, 1124 (9th Cir. 2000)(noting that cumulative error applies on habeas review);  Matlock v. Rose, 731 F.2d 1236, 1244 (6th Cir. 1984)("Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair.").

     "Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their cumulative effect prejudiced the defendant."  Ceja v. Stewart, 97 F. 3d 1246, 1254 (9th Cir. 1996), citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992).  "Although no single alleged error may warrant habeas corpus relief, the cumulative effect of errors may deprive a petitioner of the due process

right to a fair trial." <u>Karis v. Calderon</u>, 283 F.3d 1117, 1132 (9th Cir. 2002).  However, the Ninth Circuit has also recognized that where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation.  <u>See Rup v. Wood</u>, 93 F.3d 1434, 1445 (9th Cir. 1996).  As can be easily seen from the previous analyses of Petitioner's claims, no error occurred and, hence, there can be no cumulative error.

> 3. <u>Analysis</u>.

As the 5th DCA correctly pointed out, regarding Saucedo's statement to Officer Faiman and his statement to Stephanie G., no Confrontation Clause violation has been established and no violation of state evidentiary rules relative to spontaneous utterances has been shown. Also as discussed, no ineffectiveness of trial counsel has been proven.  Moreover, this Court has already agreed that any errors would have been harmless, given the state of the evidence.  Accordingly, without any established constitutional errors to accumulate, there can be no cumulative error.

## **RECOMMENDATION**

Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus (Doc. 1), be DENIED.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within **21 days** after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed **within 10 days** (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).

///

///

///

///

///

The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   __**July 31, 2015**__                   _____**/s/ Jennifer L. Thurston**_____
                                              UNITED STATES MAGISTRATE JUDGE

32